**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**ENESA PAJAZETOVIC, Executrix of the Estate**
**of Hasica Pajazetovic,[1]**

                              **Plaintiff,**                    **6:18-cv-1496 (TJM/ATB)**

        **v.**

**THE CITY OF UTICA, NEW YORK;**
**DANIEL MAHAFFY; GERALD FOSTER;**
**ASHLEY BERGER; ZACHARY CIOTTI;**
**ERIC WHITE; JOHN DOES, agents and**
**employees of the City of Utica (Bureau of Fire),**
**the identity and number of whom is presently**
**unknown; and RICHARD ROES, agents and**
**employees of the City of Utica (Police Department),**
**the identity and number of whom is presently**
**unknown,**

                              **Defendants.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**


                              **DECISION and ORDER**

**I.      INTRODUCTION**

        Plaintiff Hasica Pajazetovic commenced this civil rights action in the New York

State Supreme Court, Oneida County. Dkt. No. 2.  The action was removed to this court

on the grounds that it alleged federal constitutional violations under 42 U.S.C. § 1983 and

_____

        [1]The plaintiff in the Complaint, Hasica Pajazetovic, died on January 2, 2021.  *See* Dkt. No. 35.  The Court entered a Text Order on June 4, 2021 granting the motion of the Administratrix of the Estate of Hasica Pajazetovic to substitute the Estate in place of the deceased plaintiff, and directed the Clerk to substitute Enesa Pajazetovic, Executrix of the Estate of Hasica Pajazetovic as the plaintiff in this action. Dkt. No. 39. For purposes of this Decision and Order, the Court will refer to Hasica Pajazetovic as the plaintiff.

sought attorneys fees pursuant to 42 U.S.C. § 1988. *See* Dkt. No. 1.  The Verified

Complaint alleges eight (8) causes of action: New York state common law assault and

battery against Defendants the City of Utica ("Utica"), Daniel Mahaffy ("Mahaffy"), and

Gerald Foster ("Foster") (First Cause of Action); New York state common law prima facie

tort against Utica, Mahaffy, and Foster (Second Cause of Action); New York state

common law "negligence and recklessness" against all defendants (Third Cause of

Action); "negligent hiring, training, and retention" against Utica (Fourth Cause of Action);

failure to intercede brought pursuant to 42 U.S.C. § 1983 against Mahaffy, Foster, Ashley

Berger ("Berger"), Zachary Ciotti ("Ciotti"), Eric White ("White"), and "John Doe officers

and Richard Roe fire department employees" (Fifth Cause of Action); unreasonable and

excessive force brought pursuant to 42 U.S.C. § 1983 against Mahaffy and Foster (Sixth

Cause of Action); First and Fourteenth Amendment violations brought pursuant to 42

U.S.C. § 1983 against Mahaffy and Berger for depriving Plaintiff of his "rights to have

access to and seek redress in the courts," and for engaging in "conduct intended to cover

up and conceal the wrongful and unlawful conduct taken against plaintiff by the

defendants herein." (Seventh Cause of Action); and conspiracy to deprive Plaintiff of his

constitutional rights brought pursuant to 42 U.S.C. § 1983 against Mahaffy, Berger, Foster

and John Does (Eighth Cause of Action).  Dkt. No. 2.

Defendants move pursuant to Rule 56 of the Federal Rule of Civil Procedure

seeking summary judgment dismissing all causes of action in the Verified Complaint, *see*

Dkt. No. 25, and Plaintiff moves pursuant to Rule 56 seeking summary judgment as to

liability on some claims in the Verified Complaint and asking the Court to schedule an

inquest on damages. *See* Dkt. No. 30-2.[2]

## II.    STANDARD OF REVIEW

On a motion for summary judgment the Court must construe the properly disputed facts in the light most favorable to the non-moving party, *see Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007), and may grant summary judgment only where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 642 F.3d 110, 116 (2d Cir. 2011).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Gourd*, 467 F.3d 263, 272-73 (2d Cir. 2006).  The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin*, 467 F.3d at 273.  The nonmoving party cannot defeat summary judgment by "simply show[ing] that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), or by a factual argument based on "conjecture or surmise." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir. 1991).  In this

---

[2]Although Plaintiff's Notice of Motion seeks summary judgment as to liability on all causes of action in the Verified Complaint, *see* Dkt. No. 30, his Memorandum of Law in support of that motion is directed only to the First, Second, Third, and Sixth Causes of Action against Mahaffy and Utica, and the Fifth and Eighth Causes of Action against Mahaffy, Foster, Berger, and Utica. *See* Dkt. No.  30-2.

regard, a party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in the pleadings, *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998).

When considering cross-motions for summary judgment, the Court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Hotel Employees & Rest. Employees Union, Local 100 of N.Y. v. City of N.Y. Dep't of Parks & Recreation,* 311 F.3d 534, 543 (2d Cir. 2002)(citation omitted).   "[N]either side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it . . . [and] a district court is not required to grant judgment as a matter of law for one side or the other." *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir. 1993).

**III.   BACKGROUND**

The Court will set forth the relevant material facts in addressing the motions below.

**III.   DISCUSSION**

The Court starts with the claims that raise federal questions, addressing first the Defendants' motion directed to the federal excessive force claims against Foster and Mahaffy.

**a.  Excessive Force (Sixth Cause of Action)**

Plaintiff claims that Defendant Foster, the Utica Fire Marshall, used unconstitutional excessive force in removing him from the firefighting perimeter set up near an active fire scene, and that Defendant Mahaffy, a police officer with the Utica Police Department

4

("UPD"), used unconstitutional excessive force when he rushed in and pushed Plaintiff to the ground just as Plaintiff was escorted outside the yellow "Caution Do Not Enter" tape that marked the firefighting perimeter.

## 1. Background

The claims in this matter arise from circumstances that occurred on Sunday, December 10, 2017. In the early afternoon of that day a fire engulfed a large building owned by Plaintiff in Utica. *See* Defs. Stat. of Mat. Facts, Dkt. No. 25-1, ¶ 1.[3] The fire involved Plaintiff's auto-mechanic garage where, at the time, Plaintiff's dog was located inside. *Id.* ¶ 12. After Plaintiff learned of the fire, he went to the building in an attempt to save his dog. *Id.* ¶¶ 13-14, 18. In doing so, he was confronted by Fire Marshall Foster who told Plaintiff that he could not enter the building and that Plaintiff needed to move outside of the firefighting perimeter set up on Seymore Avenue near where Plaintiff

---

[3]The Local Rules were amended effective January 1, 2021. In the amendment, L.R. 7.1 was dissected and various subsections were renumbered and relocated to correspond with the appropriate Federal Rule. The relevant substance of the rules did not change. However, because the instant motion was filed in 2020, the Court refers to the Local Rules as they existed at that time.

Local Rule 7.1(a)(3) provided at the time:

> The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. <u>The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.</u>

LR 7.1(a)(3)(2020 Ed.)(emphasis in the original). Plaintiff's responsive Statement of Material Facts, Dkt. No. 31, does not follow this protocol. The Court declines to parse through the record to determine whether there is evidence in the record that refutes the properly supported facts in Defendants' Statement of Material Facts. *See Willis v. Cty. of Onondaga*, No. 5:14-CV-1306 (GTS/ATB), 2016 WL 7116126, at *19 (N.D.N.Y. Dec. 6, 2016)("[T]his Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement."), *aff'd*, 710 F. App'x 47 (2d Cir. 2018).

encountered Foster.  *See id*. ¶¶ 5-7, 16-19.   Plaintiff did not leave the area and continued

to attempt to get to the building to get his dog. *Id*. ¶ 18; *see* Hasica Pajazetovic Dep. at

110 (Testifying that Foster said: "I can't get inside, that nothing . . . can be saved, ... but I

said just help me with my dog.").  Plaintiff contends that he argued with Foster and "talked

about getting the overhead doors open for [Plaintiff's] dog." Hasica Pajazetovic Aff., Dkt.

No. 30-15, ¶ 3.  Defendants contend that while Plaintiff and Foster argued, Plaintiff was

flailing his arms and accidentally knocked the "Fire Marshal" helmet off of Foster's head.

Defs. Stat. of Mat. Facts ¶ 19.  Plaintiff asserts that he did not "see Fire Marshall Foster

ever wearing a helmet at the time we were arguing, or when we talked about getting the

overhead doors open for my dog, or at anytime that I saw him, including later in the

afternoon . . . ."  Hasica Pajazetovic Aff., Dkt. No. 30-15, ¶ 3.  Plaintiff contends that

Foster grabbed him by his left arm and Plaintiff said: "[D]on't touch me with my arm, I have

problem with it."  Hasica Pajazetovic 10/10/19 Dep., Dkt. 25-19, p. 110.  Plaintiff had been

involved in a motor vehicle accident in 2013 which resulted in three surgeries on his left

arm.  Defs. Stat. of Mat. Facts, ¶ 36.  Plaintiff stated in his N.Y. General Municipal Law §

50-h deposition that he had surgery to his left wrist.  *See* Dkt. No. 25-12 at 60.

Both sides rely in substantial part on a video created by a local television news

camera crew that was at the scene covering the fire, *see* Def. Ex. B; Pl. Ex. I,[4] and both

sides ask the Court to rely on the video in resolving relevant questions of fact on their

summary judgment motions. *See* Dkt. No. 25-2, p. 7, n. 1, & pp. 10-11; Dkt. No. 30-2, p. 7.

---

[4]The videos are substantially identical in relevant part, with Defendants' video containing news
commentators' statements before the portion showing the relevant actions by Plaintiff, Foster, and Mahaffy,
whereas Plaintiff's video does not have this introductory commentary.  Plaintiff's video also has a longer
section displaying the scene after Plaintiff falls to the ground and gets back up.

The video in Defendants' Exhibit B begins in relevant part at 2:14 showing Fire Marshall Foster with his back towards the yellow "Caution Do Not Enter" tape and seemingly with his hand on Plaintiff's left shoulder.  At 2:15, Plaintiff and Foster pivot towards the yellow tape with Foster pointing away from the fire vehicles towards the yellow tape and saying loudly "Get out of here, leave."  Foster appears to have hold of Plaintiff by the back of his jacket in the left shoulder area and begins ushering Plaintiff towards the yellow tape. Following behind Plaintiff and Foster is an individual in civilian clothes with his hood up over his head.[5]  Based upon Plaintiff's affidavit and the video, this appears to be Plaintiff's cousin Ado Pajazetovic.  *See* Dkt. 30-15, ¶ 5.   At 2:16 - 2:17 of the video, Foster pushes Plaintiff aggressively by the left shoulder towards the caution tape, and says loudly: "I told you three times."  At 2:18, Plaintiff reaches the tape.  At 2:19, Plaintiff uses his left arm to lift the yellow tape over his head, and pivots around so he is facing Foster.  Foster can be heard yelling: "I don't care, I told you to get over here three times."  It is unclear from the video but it appears that Foster is still physically directing Plaintiff to move behind the yellow tape.  Although Foster's right hand is obscured by Plaintiff's body, it appears that Foster is using this hand to physically direct Plaintiff behind the yellow tape and, for a brief second, uses his left hand to touch Plaintiff's right elbow presumably for the same purpose.  At 2:20 Plaintiff is a little more than an arm's length away from Foster and is behind the yellow tape standing next to another individual in civilian clothing with his hood over his head.  Foster is facing Plaintiff with his right arm extended and Plaintiff's cousin is next to Foster facing Foster.  Foster can again be heard yelling: "I don't care, I told you get

---

[5]The video depicts numerous individuals in the area with their hoods up and/or with hats on, presumably because of the cold temperature that day.

over here three times."

Officer Mahaffy, who was doing traffic control at an intersection nearby, observed the exchange between Plaintiff and Foster.  Defs. Stat. Mat. Facts, ¶ 21.  Mahaffy testified that what initially caught his attention was that Foster was yelling and that it appeared that Foster was attempting to keep Plaintiff from going in the building because Foster was standing between Plaintiff and the building and had his "arms stretched out like this trying to contain him." Mahaffy 10/07/19 Dep., Dkt. No. 25-13, p. 74.  Mahaffy also testified that based upon his observations he initially believed that Plaintiff had committed the offence of Harassment in the Second Degree.  He based this conclusion upon his observation of "the altercation [Plaintiff] had with Gerry Foster." *Id.* p. 59.  He contends that this included witnessing Plaintiff knock Foster's helmet off of his head, that it appeared that Plaintiff "was trying to get through Gerry Foster to get into the building," that Plaintiff "[w]as putting hands on Gerry to try to get by him," and that Foster then began to escort Plaintiff "out away from the fire."  *Id.* pp. 60, 73; *see id* at 72 ("I saw arms flailing. Gerry standing in front of the plaintiff with his back to the building. Plaintiff facing the building. And it looked like his arms were flailing. He knocked Gerry Foster's helmet off.").   Mahaffy testified that when he observed Plaintiff being escorted under the yellow perimeter tape it appeared to him that Plaintiff took a step back toward Foster.  *Id.* p. 80.  He also asserts that at the time he determined to intervene, it did not appear that Foster was in control of the situation because there were other people present with Plaintiff. *Id.* pp. 83- 84.[6]  Mahaffy

---

[6]Mahaffy also testified that the fact that people were there watching the situation had nothing to do with his decision to put his hands on Plaintiff because "people watch us all the time do things." *Id.* 155.  The Court does not interpret this line of questioning as meaning that Mahaffy did not consider that there were two other individuals standing around Plaintiff at the time Mahaffy determined to intervene.

began to run to Foster and Plaintiff with the intent to "aid a third person" and "create separation between" Foster and Plaintiff.  Defs. Stat. Mat. Facts ¶ 22.   At 2:20 of the video, Mahaffy is seen entering the picture moving at a fast pace from the front right of Plaintiff, lifting the caution tape, and quickly going under it.   At 2:21, Mahaffy places his left hand on Plaintiff's back below his right shoulder and, apparently, his right hand on or near the front of Plaintiff's left shoulder.  Mahaffy pushes Plaintiff backward away from Foster, Plaintiff's cousin, and the other unidentified individual standing in the group.  As Mahaffy pushes Plaintiff, Plaintiff's right arm flails upward over his head, he attempts to step backward off the sidewalk onto another slab of concrete behind the sidewalk, stumbles from Mahaffy's push, and falls on his backside/left side on a patch of grass behind the slab of concrete seemingly landing on his left elbow and rear end.  At this point, Foster comes under the yellow tape and continues to yell: "I told you three times." Mahaffy can then be seen briefly facing Plaintiff's cousin and pushing him backward away from the scene.

Plaintiff then stands up and another unidentified individual with a hood over his head places his arm around Plaintiff's shoulder.  Although neither video captures what is being said at this point, Plaintiff appears to be talking to or arguing with Foster and Mahaffy.  The video then shows Foster seemingly arguing with Plaintiff, with Foster pointing/wagging his finger, and Plaintiff slightly pushing on Foster's hand and waving his open palm in a downward motion followed by holding his palm horizontally as if to emphasize he was distraught by the situation.  On Plaintiff's video, Plaintiff can be heard saying: "That building [is] my life," and Foster can be heard telling Plaintiff to calm down and saying: "I asked you four times to get back over here and you told me no." Pl. Ex. I.

9

After pushing Plaintiff, Mahaffy, in accordance with UPD policy, immediately notified his supervisor of his use of force, and his supervisor, UPD Sergeant Ashley Berger quickly arrived at the scene and began an investigation into the use of force. Defs. Stat. of Mat. Facts, ¶ 27.  Sergeant Berger spoke to Officer Mahaffy, Fire Marshal Foster, and Plaintiff. *Id.* ¶ 28.   Sergeant Berger inquired if Plaintiff was injured and Plaintiff indicated that he was not and refused any medical treatment.  *Id.* ¶ 29; *see* Def. Ex. W (video taken from Sgt. Berger's body camera).  Plaintiff asserts, however, that he started to feel pain later in the afternoon after he spoke to Sergeant Berger. *See* Hasica Pajazetovic Aff., Dkt. No. 30-15, ¶¶ 7-8.

The next day, Plaintiff went to St. Elizabeth's Hospital complaining of back and left elbow pain.  Defs. Stat. of Mat. Facts, Dkt. No. 25-1, ¶ 35.  X-Rays of the lumbosacral spine indicated: "Spinal alignment is preserved. Minor endplate sclerosis and anterior osteophyte formation noted. No compression injury seen. Facets appear to be appropriately oriented. Pedicles intact. No acute findings. Moderate osteoarthritic change both hips."  Def. Ex. T, at p. 11.  The impression was: "Degenerative changes. No fracture is seen." *Id.*   X-Rays of the left elbow indicated: "No convincing effusion is seen. There is a small spur at the base of the olecranon. There is a small amount of spur formation at the tip of the coronoid process. No fracture or subluxation seen." *Id.* p. 13. The impression was "degenerative changes; no fracture seen."  *Id.*  Plaintiff was diagnosed with acute back pain and a left elbow contusion. Defs. Stat. of Mat. Facts, ¶ 37.

On December 19, 2017, Plaintiff treated with Dr. Cemer of Slocum-Dickson Medical Group, P.L.L.C. complaining of lower back pain and right leg pain.  Dkt. No. 30-26, at 1.

The medical record reflects: "Patient presents here complaining of having lower back pain and right leg pain (upper aspect, posterior thigh area) for about a week.  Reports that he fell down recently and pain started after the fall. No head trauma. Patient was initially evaluated for this pain at an emergency room. Had negative Xray of LS spine. No evidence of degenerative disc disease." *Id.*   Dr. Cemer assessed "BACK PAIN, LOWER as new;" "SCIATICA, RIGHT as new," prescribed Gabapentin, and referred Plaintiff to physical therapy for evaluation and treatment of lower back pain with right sided sciatica. *Id*. at 3.

On February 23, 2018, Plaintiff had an MRI of his lumbar spine as ordered by Dr. McNulty of Slocum-Dickson Medical Group. *Id.* at 5-6.  The findings in the MRI report indicate: "The vertebral body alignment is normal.  Endplate hypertrophy and disc bulging is present from L2-3 to L5-S1.  Conus medullaris lies at L1. The cauda equina is normal without intrathecal lesion. There is no marrow edema or bone lesion." *Id.* at 5.  The axial images indicate: "L1-2: Capacious canal. Minor left-sided disc bulge with normal cauda equina and foramina; L2-3: Capacious canal with mild disc bulging without significant thecal or nerve root compression; L3-4: Mild effacement of the ventral theca from disc bulge with moderate facet hypertrophy. No significant cauda equina or nerve root compression; L4-5: Minor disc bulge without significant thecal or nerve root compression; L5-S1: Facet hypertrophy without thecal or nerve root compression." *Id.* at 5-6.  The impression was: "Disc bulges are present from L2-3 through L5-S1.  Facet hypertrophy is noted generally without significant thecal or nerve root compression." *Id.* at 6.

11

On April 12, 2018, Plaintiff again treated with Dr. McNulty.  The office notes indicate that Plaintiff

> reports chronic(>6 months), central pain that is described as constant (75 - 100% of the time), achy, dull, sharp. The pain is rated as a 8/10 with the most pain being 8/10, the least pain being 3/10 over the last 2 weeks and radiates to the right buttocks down to the foot. It is aggravated by almost all movements and relieved by pain pills, walking.

> Additional Comments: Patient states that his shop was on fire, and was pushed by a cop and fell on the ground. Denies any numbness/tingling.

> Additional Comments: Patient states he was in a car accident 2/11/2013. Patient was the driven [sic] in the car accident. He was in a truck and hit on the passenger side of the vehicle and went to stop himself with the left hand, hit the door and the air bag went off. Complains of numbness/tingling in the left arm from shoulder to fingers.

*Id.* at 7. The notes also indicate that "patient denies prior existing shoulder pain until a recent altercation with police being thrown to the ground." *Id.* at 10.  Dr. McNulty's plan was to continue physical therapy for the low back and left shoulder, and schedule cortisone injections for Plaintiff's low back and shoulder. *Id.*  Plaintiff treated with Dr. McNulty again on May 23, 2018, at which time it was indicated: "4/20/2018 bilateral upper extremity EMG this [sic] normal without evidence of denervation no evidence of radiculopathy was seen," that "[s]houlder pain carpal tunnel syndrome low back pain has undergone several visits for physical therapy still in pain discussed injections today and continuing physical therapy also reviewed new imaging and new emg report. discussed again ... increasing gabapentin to 600 tid. still with pain didn't undergo injections as suggested discussed obtaining surgical opinion for shoulder and back." *Id.* at 13.

On June 11, 2018, Plaintiff treated with Sarah Waskiewicz, RPA-C of Slocum-Dickson Medical Group Orthopaedics on referral from Dr. McNulty regarding

12

Plaintiff's left shoulder pain. *Id.* at 16-19.  Ms. Waskiewicz's plan after that office visit was: "Patient is 7 months post fall on the left shoulder. He has tried NSAIDS and PT without relief.  He currently follows Dr. McNulty for LBP which is worse than shoulder at this point. Reviewed xrays Left Shoulder. Due to pain and weakness on exam, I have recommended MRI Left Shoulder to R/O RCT.  Follow up after MRI for further recommendations." *Id.* at 18.  The record indicates that Plaintiff was also treated by Dr. Buckley of Hamilton Orthopedic who, on February 4, 2019, diagnosed Plaintiff with right lower extremity radiculopathy, foraminal stenosis, and sent him to physical therapy. *See* Defs. Stat. of Mat. Facts, ¶ 39; Def. Ex.  AA, Dkt. No. 25-27, at p. 8.

### 2.  Fire Marshall Foster

As to the excessive force claim, Defendants' memorandum of law in support of summary judgment focuses primarily on Officer Mahaffy's actions.  *See* Dkt. No. 25-2, at pp. 7-12.  Defendants argue, however, that "Defendants are entitled to summary judgment on the excessive force claim because the video depicts Plaintiff Pajazetovic was within the fire perimeter and he was resisting a lawful order, making the use of force reasonable as a matter of law," *id.* at 7, and that "the news reporter's camera video indisputably shows Plaintiff resisting the lawful commands of Fire Marshall Foster to leave the working fire perimeter, and shows Fire Marshal Foster escorting the Plaintiff out of the established perimeter area." *Id.* at 10.  Furthermore, Defendants argue that "the individual defendants are entitled to qualified immunity on all federal § 1983 claims and state claims." *Id.* at 20; *see id.* at 20-26.

Although Defendants' arguments are somewhat conclusory as to Foster, Plaintiff

offers no opposition to the argument that Foster is entitled to summary judgment on the excessive force claim or that he is entitled to qualified immunity on this claim. *See* Dkt. No. 31-1. Furthermore, in his own motion Plaintiff seeks summary judgment on the excessive force claim brought directly against Mahaffy but not against Foster. *See* Dkt. No. 30-2, pp. 5-8. Based upon Plaintiff's failure to defend or affirmatively pursue the claim, the Court deems the excessive force claim against Foster abandoned. *See Kovaco v. Rockbestos-Suprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016)("'[G]enerally, but perhaps not always, a partial response reflects a decision by a party's attorney to pursue some claims or defenses and to abandon others,' and 'a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.'")(quoting *Jackson v. Fed. Express*, 766 F.3d 189, 196, 198 (2d Cir. 2014)); *Santana v. Racette*, No. 9:17-CV-00102 (BKS/ML), 2020 WL 3412728, at *8, n. 12 (N.D.N.Y. June 22, 2020)("The failure to oppose a motion for summary judgment on a certain claim is deemed abandonment of the claim.")(citing *Feacher v. Intercontinental Hotels Grp.*, 563 F. Supp. 2d 389, 399 (N.D.N.Y. 2008)); *Feacher*, 563 F. Supp. 2d at 399 (same)(citing *Rizzo–Puccio v. College Auxiliary Services, Inc.*, 216 F.3d 1073, 2000 WL 777955 (2d Cir. 2000)(claims not addressed in opposition to defendants' motion for summary judgment were deemed abandoned)); *Bucek v. Gallagher Bassett Servs., Inc.*, No. 16-CV-1344, 2018 WL 1609334, at *14 n.25 (S.D.N.Y. Mar. 29, 2018) (deeming claims abandoned where the plaintiff failed to respond to the defendant's arguments in her opposition); *Lipton v. County of Orange*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004)("This Court may, and generally will, deem a claim abandoned

14

when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed.")(collecting cases).  Accordingly, summary judgment is granted to Defendants on the federal excessive force claim against Foster.

### 3.  Officer Mahaffy

Defendants argue that Mahaffy is entitled to summary judgment on the federal excessive force claim because the video depicts that Plaintiff was resisting a lawful order to leave the fire perimeter making the use of force reasonable as a matter of law, Dkt. No. 25-2 at 7-12, and that he is entitled to qualified immunity on this claim.  *Id.* at 24-26.  In opposition, Plaintiff argues that Mahaffy's use of force was objectively unreasonable under the circumstances, *see* Dkt. No. 31-1 at CM/ECF pp. 3-6, but presents no opposition to Defendants' claim that Mahaffy is entitled to qualified immunity.  *See generally id.*

 "In this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have 'consented' to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3)."[7] *CF Fresh, LLC, v. Carioto Produce, Inc*., No. 1:20-CV-0884 (GTS/CFH), 2021 WL 4129161, at *8 (N.D.N.Y. Sept. 10, 2021).  "Stated another way, when a non-movant fails to oppose a legal argument asserted by the movant, the movant may succeed on the argument by showing that the argument possesses facial merit, which has appropriately been characterized as a 'modest' burden."  *Id.* (citing N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested

_____

[7]The relevant substance of Local Rule 7.1(a)(3) was formerly contained in Local Rule 7.1(b)(3).

therein ...."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y.

Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009

WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases)).

The Court reviews the excessive force claim against Mahaffy under the Fourth

Amendment's "objective reasonableness" standard as articulated in *Graham v. Connor*,

490 U.S. 386, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989), and its progeny. *See Frego v.*

*Kelsick*, No. 11-CV-5462 (SJF/SIL), 2015 WL 4728922, at *9 (E.D.N.Y. Aug. 10, 2015),[8]

*aff'd*, 690 F. App'x 706 (2d Cir. 2017).   Under this standard,

> an application of force under color of state law "is excessive, in violation of
> the Fourth Amendment, if it is objectively unreasonable 'in light of the facts
> and circumstances confronting [the officers], without regard to their
> underlying intent or motivation.'" *Figueroa v. Mazza*, 11–CV–3160, 2014 U.S.
> Dist. LEXIS 139212, at *12–*13, 2014 WL 4853408 (E.D.N.Y., Sept. 30,
> 2012) (quoting Graham, 490 U.S. at 397)). "'Not every push or shove, even if
> it may later seem unnecessary in the peace of a judge's chambers, violates
> the Fourth Amendment.'" *Id*. (quoting *Graham*, 490 U.S. at 396 (internal
> citation and quotation marks omitted)). Rather, "[d]etermining whether the
> force used was reasonable 'requires a careful balancing of the nature and
> quality of the intrusion on the individual's Fourth Amendment interests

---

[8]The Eastern District wrote in *Frego* that the principles underlying the Fourth Amendment's "objective reasonableness" standard "apply equally where, as here, the alleged force used was against a third-party and not the arrestee." 2015 WL 4728922, at *9 (citing *Kerman v. City of New York*, 261 F.3d 229 (2d Cir. 2001) (applying Fourth Amendment's objective reasonableness standard to excessive force claim by non-arrestee who was detained and taken by police to a psychiatric hospital; the court noted that "*[a]ll* claims that law enforcement officers have used excessive force—deadly or not-in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard ...." (citing *Graham*, 490 U.S. at 395) (emphasis in original)); *Estate of Heilbut v. City of New York*, 04 Civ. 4332, 2006 U.S. Dist. LEXIS 71907, at *18 n. 12, 2006 WL 2807722 (S.D .N.Y., Oct. 2, 2006) (declining to analyze non-arrestee, non-inmate's excessive force claim under the Fourteenth Amendment, instead noting that all such claims are to be considered under the Fourth Amendment rubric); *Gravelet–Blondin v. Shelton*, 728 F.3d 1086, 1090–91 (9th Cir.2013), cert. denied, —— U.S. ——, 134 S.Ct. 1292, 188 L.Ed.2d 301 (2014) (applying Fourth Amendment's objective reasonableness standard to excessive force claim by bystander upon whom police used a taser for not immediately complying with an officer's instruction to back away from the scene of an arrest); *Holland v. Harrington*, 268 F.3d 1179, 1188 (10th Cir.2001), cert. denied, 535 U.S. 1056, 122 S.Ct. 1914, 152 L.Ed.2d 824 (2002) (applying Fourth Amendment's objective reasonableness standard to excessive force claim where, in execution of an arrest warrant, SWAT Team members ordered non-arrestees onto the ground at gunpoint and handcuffed them while conducting searches for "wants and warrants")).

against the countervailing governmental interests at stake.'" *Roguz v. Walsh*, CV 09–1052, 2013 U.S. Dist. LEXIS 50985, at *4–*5, 2013 WL 1498126 (D.Conn., Apr. 5, 2013) (quoting *Graham*, 490 U.S. at 369 (quotations and citations omitted)). "The assessment involves consideration of the facts and circumstances confronting the officers, including the severity of the crime at issue, whether the suspect posed an immediate threat to the officers or others, and whether the suspect was resisting arrest or attempting to flee to evade arrest." *Id.* "Reasonableness is judged 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,' while considering that 'police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain and rapidly evolving-about the amount of force that is necessary in a particular situation.'" *Id.* (quoting *Graham*, 490 U.S. at 397).

*Frego*, 2015 WL 4728922, at *8.

Assuming without deciding that Officer Mahaffy's push of Plaintiff constituted unconstitutional excessive force, the Court examines whether Defendants have presented a facially meritorious claim for qualified immunity in their memorandum of law. *See CF Fresh,* 2021 WL 4129161, at *8; Local Rule 7.1(b)(3). Qualified immunity is an affirmative defense on which the defendant bears the burden of proof. *See Jackler v. Byrne*, 658 F.3d 225, 242 (2d Cir. 2011). "It 'protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Ismael v. Charles*, No. 1:18-CV-3597-GHW, 2020 WL 4003291, at *8 (S.D.N.Y. July 15, 2020)(quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009))(interior quotation marks and citation omitted). "The doctrine thus 'balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Id.* (quoting *Pearson*, 555 U.S. at 231).

17

"Courts 'evaluate claims of qualified immunity at summary judgment using a two-part inquiry: (1) whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right and (2) whether the right in question was clearly established at the time of the violation.'" *Id.* at *9 (quoting *Sloley v. Vanbramer*, 945 F.3d 30, 36 (2d Cir. 2019)(internal quotation marks and citation omitted). "'Courts have discretion in deciding the order in which to analyze the two prongs but under either, they may not resolve genuine disputes of' material fact.'" *Id.* (quoting *Sloley*, 945 F.3d at 36 (internal quotation marks and citation omitted).

> "'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)(quotation omitted). "[E]xisting law must have placed the constitutionality of the officer's conduct beyond debate." *Id.* (quotation omitted). "This demanding standard protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (quotation omitted). The Supreme Court has "repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Id.* at 590 (quotation omitted).
>
> Qualified immunity protects an officer so long as "it was objectively reasonable for the officer to believe the conduct at issue was lawful." *Mudge v. Zugalla*, 939 F.3d 72, 79 (2d Cir. 2019)(quotation omitted). "An officer is entitled to qualified immunity if *any* reasonable officer, out of the wide range of reasonable people who enforce the laws in this country, could have determined that the challenged action was lawful." *Muschette v. Gionfriddo*, 910 F.3d 65, 70 (2d Cir. 2018) (quotation omitted).

*Id.*

Here, even when taking the facts in the light most favorable to Plaintiff, the Court concludes that a reasonable officer, situated as Officer Mahaffy was, could have determined that rushing in and pushing Plaintiff away from Foster was lawful.  Even if

18

Mahaffy did not see Plaintiff knock Foster's helmet off his head, the facts are undisputed that he witnessed Plaintiff arguing with Foster about getting to the burning building in an attempt to save Plaintiff's dog.  Further, as evidenced by the video both sides present, Mahaffy was able to observe that Foster had to physically escort Plaintiff outside the yellow tape marking the firefighting perimeter.  Moreover, the video depicts that when Plaintiff reached the yellow tape he pivoted around so that he was facing Foster.  At this point, Plaintiff was at close range to Foster, and Foster was seemingly continuing to physically force Plaintiff to leave the firefighting area while continuing to yell at Plaintiff to leave.   Although Plaintiff may have pivoted around to face Foster only to continue to plead with him to try to rescue Plaintiff's dog, a reasonable officer in Mahaffy's position could have interpreted the situation - including that Foster was seemingly continuing to physically push Plaintiff back and was yelling at Plaintiff to leave the area - as a continuation or escalation of the confrontation between Plaintiff and Foster from inside the firefighting perimeter.  Under these rapidly evolving circumstances, the Court cannot conclude that no reasonable officer would have thought it was unlawful to rush in and push Plaintiff backwards to create separation between Plaintiff and Foster to prevent any further escalation of what appeared to be a physical confrontation between the two. Thus, the Court will grant summary judgment to Mahaffy on the excessive force claim on qualified immunity grounds.

### b.  Failure to Intercede (Fifth Cause of Action)

Plaintiff alleges in the Fifth Cause of Action: "By their conduct and under color of state law, it is believed that the defendants Mahaffy, Foster, Berger, Ciotti, White, and John Doe officers and Richard Roe fire department employees, each had opportunities to

intercede on behalf of plaintiff to prevent the excessive use of force and unreasonable seizure but due to their intentional conduct or deliberate indifference declined or refused to do so." Compl. ¶ 65.  Defendants move to dismiss the failure-to-intercede claims.  *See* Dkt. No. 25-2 at pp. 26-27.   Plaintiff does not respond in opposition to this aspect of Defendant's motion.  *See* Dkt. No. 31-1.  Thus, to determine whether Plaintiff will be deemed to have consented to Defendants' arguments for dismissal of the failure-to-intercede claims, the Court must determine whether Defendants have met their modest burden of showing that their argument possesses facial merit. *See CF Fresh,* 2021 WL 4129161, at *8; Local Rule 7.1(b)(3).

"An officer who fails to intervene is 'liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know that excessive force is being used.'" *Gochnour v. Burri*, No. 6:15-CV-06174 EAW, 2018 WL 10944594, at *3 (W.D.N.Y. July 9, 2018)(quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). "Thus, liability attaches where (1) the officer had a realistic opportunity to intervene to prevent the harm; (2) a reasonable person in the officer's position would have known that the victim's constitutional rights were being violated; and (3) the officer did not take reasonable steps to intervene." *Id.* (citing *Jean–Laurent v. Wilkerson*, 438 F. Supp. 2d 318, 327 (S.D.N.Y. 2006), *aff'd*, 461 F. App'x 18 (2d Cir. 2012)); *see Vann v. Sudranski*, No. 16-cv-7367 (VB), 2020 WL 3001072, at *6 (S.D.N.Y. June 4, 2020)("[F]or liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring.")(quoting *Jean-Laurent v. Wilkerson*, 461 F. App'x 18, 21 (2d Cir. 2012)). "Whether the officer had a 'realistic opportunity' to intervene is normally a question for the

20

jury, unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Sloley v. Vanbramer*, 945 F.3d 30, 47 (2d Cir. 2019)(citation omitted).

Assuming without deciding that Foster, as a firefighter, had a legal obligation to intervene to stop Officer Mahaffy's use of excessive force by pushing Plaintiff, the video makes clear that the push occurred so rapidly and so suddenly that Foster did not have a realistic opportunity to intervene to stop it, and no reasonable factfinder cooould conlude otherwise. *See O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988)(Holding that an officer could not be held liable for failing to intervene in a beating because "[t]he three blows were struck in such rapid succession that [the defendant] had no realistic opportunity to attempt to prevent them."); *McLeod v. Llano*, No. 17-CV-6062 (ARR/SMG), 2019 WL 1129429, at *3 (E.D.N.Y. Mar. 12, 2019)("[I]t is well-established that an officer is not liable for failing to intervene if the use of force is 'sudden and brief.'")(citing *Cusamano v. Sobek*, 604 F. Supp.2d 416, 428 n.9 (N.D.N.Y. 2009)); *Elufe v. Aylward*, No. 09-CV-458 (KAM)(LB), 2011 WL 477685, at *9 (E.D.N.Y. Feb. 4, 2011)("Where the alleged force consists of a single push or a 'rapid succession' of blows, courts have found that the officer did not have a realistic opportunity to intervene.") (citing *O'Neill*, 839 F.2d at 11–12)); *see also Jackson v. City of White Plains*, No. 05-cv-0491 (NSR), 2015 WL 4739762, at *8 (S.D.N.Y. Aug. 7, 2015) (holding that a police officer who was in close proximity to the plaintiff did not have a realistic opportunity to intervene where another officer "punched [the plaintiff], spoke one short sentence, and punched him again"); *Johnson v. City of N.Y.*, 05-cv-7519, 2008 WL 4450270 at *6 (S.D.N.Y. Sept. 29, 2008)(granting summary judgment for police officers on failure-to-intervene claims where the alleged force lasted only a couple of seconds);

21

*Jean-Laurent v. Wilkerson*, 438 F. Supp.2d 318, 327 (S.D.N.Y. 2006)(granting a motion to dismiss plaintiff's failure to intervene claims where the alleged use of force was too rapid for the defendants to have a realistic opportunity to intervene), *aff'd in relevant part*, 461 F. App'x 18 (2d Cir. 2012).  Thus, Defendants' motion seeking summary judgment on the failure-to-intercede claim against Foster is granted.

Although Plaintiff seemingly asserts in the Verified Complaint that Officer Mahaffy had a duty to intercede to stop another officer from using excessive force, Defendants point out that when Plaintiff was deposed on December 5, 2019, and was questioned as to who he claims should have interceded, Plaintiff testified: "Nobody. He could have come up and talk to me nicely. He didn't have any conversation with me.  He just pushed me from the back." Hasica Pajazetovic 12/05/19 Dep. at p. 83.  Even assuming that Plaintiff has a failure-to-intercede claim against Mahaffy for failing to intercede in Foster's purported excessive force in touching Plaintiff's left arm within the firefighting perimeter, a reasonable person in Officer Mahaffy's position would not have known that Plaintiff's constitutional rights were being violated by this seemingly innocuous conduct. Plaintiff's arms were covered by his camouflaged jacket, and there is no indication that Plaintiff outwardly displayed some infirmity with his left arm that Mahaffy would have been aware from his position.   Furthermore, the video indicates that Foster grabbed Plaintiff by the back of his coat near his left shoulder when Foster physically directed Plaintiff to the yellow tape marking the perimeter of the firefighting area.  A reasonable officer in Mahaffy's position would not have interpreted that this conduct, under the circumstances, amounted to unconstitutional excessive force.   Defendants' motion for summary judgment on this ground is granted, and the failure-to-intercede claim against Mahaffy is dismissed.

22

Plaintiff has failed to demonstrate that Defendants Berger, Ciotti, White, the unidentified John Doe officers, and the unidentified Richard Roe fire department employees had opportunities to intercede on behalf of Plaintiff to prevent the excessive use of force by any officer or any defendant.  Thus, summary judgment is granted to these defendants dismissing the failure-to-intercede claims against them.

### c.  First and Fourteenth Amendments (Seventh Cause of Action)

Plaintiff asserts in the Seventh Cause of Action:

71. By their conduct and under color of state law, the defendants Mahaffy and Berger deprived defendant [sic] of his First and Fourteenth Amendment rights to have access to and seek redress in the courts.

72. The defendants engaged in conduct intended to cover up and conceal the wrongful and unlawful conduct taken against plaintiff by the defendants herein.

Dkt. No. 2, at ¶¶ 71-72.

Defendants move for summary judgment on this cause of action.  *See* Dkt. No. 25-2 at 28-29.  Defendants point out that when Plaintiff was asked at his deposition how the defendants' conduct denied him access to the courts to redress his grievances arising from the conduct in issue here, Plaintiff responded: "No one has stopped me from going to court." Hasica Pajazetovic Dep. at p. 92.   Moreover, Defendants argue that Defendants Mahaffy and Berger properly recorded the events of December 10, 2017 in accordance with the UPD's use of force protocol.  *See* Dkt. No. 25-2, at pp. 28-29.

Plaintiff has not responded in opposition to this aspect of Defendants' motion.  *See* Dkt. No. 31-1.  Plaintiff also does not seek summary judgment on the Seventh Cause of Action in his motion seeking summary judgment.  *See* Dkt. No. 30-2.  Thus, the Court

deems the Seventh Cause of Action abandoned.  Furthermore, under a Local Rule

7.1(b)(3) analysis the Court finds that Defendants meet their burden of demonstrating a

meritorious argument for summary judgment on this claim.  Plaintiff has not demonstrated

that he was denied access to any court by Defendants' actions, and, as discussed next,

Plaintiff has not demonstrated that Defendants engaged in conduct to cover up the actions

taken against Plaintiff.  Accordingly, the Court grants summary judgment to Defendants on

the Seventh Cause of Action.

### d.  Conspiracy (Eighth Cause of Action)

 In the Eighth Cause of Action brought pursuant to 42 U.S.C. § 1983, Plaintiff

alleges:

> 75. Defendants Mahaffy, Berger, Foster, and John Does under color of law
> conspired with one another to deprive plaintiff of his constitutional rights,
> including the rights to be free from the intentional use of unreasonable force
> and to have access to and seek redress in the courts.
>
> 76. In furtherance of the conspiracy and in order to cover up the assault and
> battery of the plaintiff, defendants engaged in the following, among other
> conduct:
>
>> a. Submitting false narratives to insulate Mahaffy and Foster from
>> administrative and criminal sanctions;
>>
>> b. Upon information and belief, jointly devising a false, exculpatory
>> version of the events of December 10, 2017;
>>
>> c. Refusing to come forward with evidence and information that would
>> incriminate the individuals involved, in violation of individual
>> defendants' sworn duty as police officers;
>>
>> d. Although they were aware of the assault and battery of the plaintiff,
>> and were required to report it immediately, they deliberately
>> suppressed the truth.

Dkt. No. 2, at ¶¶ 75-76.

Defendants move for summary judgment on this cause of action, arguing, *inter alia*, that "Plaintiff offers absolutely nothing substantive to support a contention that the Defendants formed an agreement to violate his rights," that the claim is barred by the intracorporate conspiracy doctrine, and that Plaintiff provides no evidence "to suggest that Defendants were motivated by an independent personal stake in his removal from the fire scene." Dkt. No. 25-2, at pp. 29-33.  Plaintiff offers no opposition to Defendants' motion addressed to the Eighth Cause of Action. *See* Dkt. No. 31-1.

The Court finds that Defendants' arguments for summary judgment on the Section 1983 conspiracy claim meet their modest burden of showing that their arguments possess facial merit. *See CF Fresh,* 2021 WL 4129161, at *8; Local Rule 7.1(b)(3).  Without factual support for the contention that the Defendants formed an agreement to violate Plaintiff's civil rights, the claim is legally deficient. *See Ciambrello v. County of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002)(In order to survive a motion to dismiss on his § 1983 conspiracy claim, plaintiff must allege (1) an agreement between two or more state actors, or a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages.)(citing *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir.1999)); *id.* at 325 ("[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed.")(quoting *Dwares v. City of N.Y.*, 985 F.2d 94, 100 (2d Cir.1993)); *Walker v. Jastremski*, 430 F.3d 560, 564 n. 5 (2d Cir.2005) ("[C]onclusory or general allegations are insufficient to state a claim for conspiracy under § 1983...."); *McIntyre v. Longwood*

25

*Central School Dist*., No. 07 Civ. 1337(JFB), 2008 WL 850263, at * 11 (E.D.N.Y. Mar.27, 2008)(Although "[a] plaintiff is not required to list the place and date of defendants['] meetings and the summary of their conversations when he pleads conspiracy, [ ] the pleadings must present facts tending to show agreement and concerted action.")(internal quotation marks and citations omitted).

Furthermore, "[t]he intracorporate conspiracy doctrine posits that the officers, agents, and employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring with each other." *Rodriguez v. City of New York*, No. 05 Civ. 5117(JFB), 2008 WL 420015, at *25 (E.D.N.Y. Feb.11, 2005)(citation omitted); *see Peck v. Cty. of Onondaga, New York*, No. 5:21-CV-651, 2021 WL 3710546, at *15 (N.D.N.Y. Aug. 20, 2021)("Courts in the Second Circuit recognize the 'intracorporate conspiracy doctrine,' which holds that the 'officers, agents, and employees of a single corporate entity are legally incapable of conspiring together.'")(quoting *Hartline v. Gallo*, 546 F.3d 95, 99 n.3 (2d Cir. 2008) (internal citations and quotation marks omitted)). "The doctrine's root logic is that 'because employees acting within the scope of their employment are agents of their employer, an employer and its employees are generally considered to be a single actor, rather than multiple conspirators.'" *Johnston v. City of Syracuse*, No. 5:20-CV-1497, 2021 WL 3930703, at *9 (N.D.N.Y. Sept. 2, 2021)(quoting *Fed. Ins. Co. v. United States*, 882 F.3d 348, 368 (2d Cir. 2018)). Although the Second Circuit has only applied the doctrine in the context of Section 1985 conspiracies, the Court agrees with those courts that have applied the

26

doctrine to Section 1983 conspiracies. *See Peck*, 2021 WL 3710546, at *15-*16.[9]  Here,

because all defendants were employed by Utica, the intracorporate conspiracy doctrine

bars the conspiracy claim unless an exception to that doctrine applies.

The "personal stake" exception to the intracorporate conspiracy doctrine allows for

a corporate employee to nevertheless conspire with his or her coworkers if he or she is

"motivated by an improper personal interest separate and apart from that of their

principal." *Peck*, 2021 WL 3710546, at *15.  "A personal stake typically contemplates that

the defendant 'exercises official duties in unconstitutional ways to secure personal

benefit.'" *Johnston*, 2021 WL 3930703, at *9 (quoting *Peck*, 2021 WL 3710546, at

*15)(citations omitted).  "Some examples of a personal stake include infringing a plaintiff's

rights to cover up for a prior use of excessive force, engaging in race-based false arrests

---

[9]Judge Hurd wrote in *Peck*:

The Second Circuit has routinely applied the doctrine to § 1985 claims, although it has not yet applied it to claims under § 1983. *Ali v. Connick*, 136 F. Supp. 3d 270, 282 (E.D.N.Y. 2015). However, most courts in this Circuit have applied the intracorporate conspiracy doctrine to § 1983 conspiracies as well, reasoning that which statute a court is applying does not alter the doctrine's foundational logic. *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 388 (S.D.N.Y. 2013) (collecting cases).

That logic runs like this: a conspiracy by definition must involve multiple people. *Chamberlain*, 986 F. Supp. 2d at 388.  But if everyone involved in the conspiracy acted as an agent of the same corporate entity, in reality the acts were not borne out by a conspiracy of individuals, but by a single corporate actor. *See id.*  Because municipalities are themselves corporations, the same logic has been extended to local governments as well. *See Broich v. Inc. Vill. of Southampton*, 650 F. Supp. 2d 234, 247 (E.D.N.Y. 2009) (applying intracorporate conspiracy doctrine to village).

* * *

As an initial matter, this Court agrees that the logic behind the intracorporate conspiracy doctrine carries over from § 1985 to § 1983. *See Chamberlain*, 986 F. Supp. 2d at 388 (collecting cases for principle that intracorporate conspiracy doctrine should apply to § 1983 claims as well).

2021 WL 3710546, at *15-*16.

27

to boost arrest numbers in pursuit of a promotion, or acting out of pure malice." *Id.* (citing *Ali v. Connick*, 136 F. Supp. 3d 270, 282-83 (E.D.N.Y. 2015)).

Although Plaintiff alleges in the Verified Complaint that the defendants conspired "in order to cover up the assault and battery of the plaintiff" and did so by submitting "false narratives," an examination of the claims made here reveals that Plaintiff's grievance is that the defendants did not put enough information in the use of force reports which could have aided him on his claims in this case, or that amounts to quibbles over the verbiage of the statements made in the use of force reports. *See* Dkt. No. 30-2 at p. 4;[10] *Id.* at 6.[11]

A review of the use of force reports by the various UPD officials does not support a conclusion that the defendants attempted to cover up Officer Mahaffy's use of force by submitting false narratives.  Officer Mahaffy's narrative indicates:

---

[10]Plaintiff argues in his memorandum of law in support of his summary judgment motion:

In reporting his use of force to the Sergeant, the Defendant Ashley Berger, the Defendant Daniel Mahaffy reported that he had used force due to a "shouting match" between the plaintiff and Fire Marshall Foster. Foster never asked for aid. No photos were taken of Mr. Pajazetovic or of the scene or of the allegedly raised piece of sidewalk upon which the defendants claim he fell, and no witnesses were interviewed other than a cursory discussion with the Plaintiff, Defendant Mahaffy, and Defendant Foster. Sergeant Berger then reported her findings to the Lieutenant, Sean Dougherty, who then sent a report to the captain. That entire process is documented in narratives contained in the police report, and nowhere do the narratives indicate that Mr. Pajazetovic knocked Defendant Foster's helmet off.

Dkt. No. 30-2 at p. 4.

[11]Plaintiff argues in connection with his failure to train and supervise claim:

There is supervisory liability by the City of Utica in its failure not only to properly train but also to supervise. There was only a superficial investigation conducted where not all evidence was gathered. For example (not an exhaustive list), not all witnesses were interviewed, and it was claimed that the plaintiff tripped on a sidewalk but no photographs of the sidewalk were secured. This was "rubber-stamped" up the chain of command, demonstrating that there is a municipal custom to perform only the most cursory investigation to exonerate the officer without full development of the facts.

Dkt. No. 30-2 at  6.

At about 1 :50pm I was standing by a tree next to my car and saw a firemen involved in an altercation with a civilian dressed in all camo in the parking lot of 329 South St. I immediately went to aid the firemen [sic] who I now realized was Fire Marshall Gerald Foster. Foster was yelling at the male to get back and had him by his shirt collar pulling him west across Seymour Ave and I immediately ran toward the altercation at which time my BWC #5182 went flying off of my jacket. Fire Marshall Foster reached the other side of the tape at which time he let go of the male who I now know to be Hasic [sic] Pajazetovic.  Pajazetovic then lunged forward back at Fire Marshall Foster at which time I pushed him back and he lost his footing on the sidewalk and fell. Pajazetovic got right back up at which time Fire Marshall Foster began to explain the situation to him and he calmed down and advised us he was the owner of the structure that was on fire and he only wanted to go in to get his dog.

Dkt. 30-14 at p. 4.

Sgt. Berger's narrative indicates:

While the building was still on fire a white male went inside the secure area of the scene and attempted to get into the building several times. The male had to be physically removed from the scene by Fire Marshall Foster and he continued to be physically resistant with FM Foster and attempted to get back into the building. PO Mahaffy observed the male pushing back on FM Foster while he was forcefully removing him and verbally telling him to leave for the third time. Believing that the male was fighting with Fire Personnel and refusing to leave the scene, PO Mahaffy ran to the aid of FM Foster and got in between the two and pushed the male to get him away from FM Foster and the active fire scene. When PO Mahaffy pushed the male the male lost his footing and tripped on the sidewalk, causing him to fall back on to his rear end. PO Mahaffy then learned that the male is Hasica Pajazetovic and is the owner of the business that was on fire. Hasica was not injured and did not make a complaint. He stated he understood why the Fire Marshall and Police Officer acted the way they did and he was just distraught over his building being on fire and him having valuables inside.

Id. at pp. 4-5.

In an addendum, Sgt. Berger indicates:

Immediately after the incident PO Mahaffy called my cell phone as I was checking on the barricades located on Rutger St.  PO Mahaffy advised me of the incident and I responded to his location. Upon my arrival I spoke with Hasica Pajazetovic about what happened. Another male, which Hasica identified as his son-in-law, acted as a translator to ensure Hasica and me

29

and the other officials understood each other. Hasica stated that he was concerned about his dog being in the building and that is why he kept trying to enter it. He stated several times that the building is all that he has. Hasica said that he was not injured and that he understood why FM Foster and PO Mahaffy did what they did. I also spoke with FM Foster who advised me that Hasica entered the firefighters area of operations and was told to leave several times. FM Foster said that because Hasica was not complying he took a hold of Hasica and began to physically escort him out of the scene. FM Foster stated that he and Hasica had a physical back and forth and it would have appeared to be a scuffle to PO Mahaffy. FM Foster said PO Mahaffy came to his aid and pushed Hasica away from the FM to separate the two and when he did that Hasica lost his footing and fell down onto his rear end. FM Foster said that Hasica did not hit his head during the fall and was not at all injured. FM Foster said this all in the presence of Hasica and his son-in-law. I verified with Hasica that he understood why the officer and Fire Marshall acted the way they did and he agreed.

Investigative Findings:

Upon reviewing all reports, narratives, and watching the video footage, I concluded the following: PO Mahaffy acted appropriately to protect the safety of the Utica Fire Marshal, the property owner, and to protect the integrity of the scene. Due to the nature of the incident PO Mahaffy chose to use discretion and not arrest Hasica for Obstructing Firefighting Operations (PL 195.15), though an arrest for same would have been lawful. The Response to Resistance was in compliance with Policy and Procedures of the Utica Police Department and applicable laws. The force used in this instance was lawful, authorized, justified and within department guidelines.

*Id.* at p. 7.

Lt. Sean Dougherty's memo to Chief of Police Mark W. Williams indicates:

While Mahaffy was conducting crowd/traffic control, a white male, Hasica Pajazetovic, entered the taped off area and attempted to enter the burning structure. As a result, the Fire Marshal, Gerald Foster, had to physically remove Pajazetovic from the scene. From his post, Mahaffy observed Pajazetovic resisting Foster's efforts to remove him and ran over to assist. Seeing that the two were still engaged, Mahaffy pushed Pajazetovic away from Foster. Pajazetovic lost his footing and fell backwards, onto the ground. Some family members of Pajazetovic stepped in and the situation eventually de-escalated. Mahaffy chose not to arrest Pajazetovic for Obstructing Firefighting Operations, after learning that he was the owner of the burning structure. Pajazetovic was not injured as a result of being pushed down and after being interviewed by Berger, understood why Foster and Mahaffy

reacted the way they did. Any BWC footage related to the incident was tagged. No photographs were taken.  Footage from a news media outlet was secured on a memory stick and forwarded to Professional Standards, with my report.

Findings:

Based upon my review of this incident, I agree with Berger's findings that Mahaffy acted in accordance with our procedural manual, when he pushed Pajazetovic away from Fire Marshal Foster. This case-is ready for closure.

*Id.* at pp. 5-6.

These narratives each recount the situation generally consistent with that displayed in the videos each side presented.  Although the officials say in their reports that Plaintiff "lost his footing on the sidewalk and fell," "lost his footing and tripped on the sidewalk, causing him to fall back on to his rear end," "lost his footing and fell down," and "lost his footing and fell backwards," all statements indicate that the fall directly followed Mahaffy's push of Plaintiff.  By connecting Plaintiff's fall to Mahaffy's push, the narratives do not amount to false information intended to cover up Mahaffy's use of force.  Further, even assuming that there are some deficiencies in the content of the use of force reports that do not fully comply with the UPD's policy, these deficiencies do not indicate that the defendants were attempting to cover up that Mahaffy used force by pushing Plaintiff causing him to fall.  Thus, there is no basis to apply the personal stake exception to the intracorporate conspiracy doctrine.  That being the case, Defendants' motion seeking summary judgment on the Section 1983 conspiracy claim alleged in the Verified Complaint is granted.

### e.  State Law Claims

Although the parties indicate that the Third Cause of Action might assert a claim

31

under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), the claim is specifically

pled as a negligent hiring, training, and retention claim. *See* Dkt. No. 2 at ¶ 63 ("That the

aforesaid incident and resulting damage to the plaintiff were due to the negligence of the

City of Utica, its agents, servants and/or employees, . . . in the hiring, training, and

retention of the involved UPD officers, . . . [and] in the hiring, training, and retention of the

involved UFD employees, including Foster.").  "Failure to train or supervise city employees

may constitute an official policy or custom supporting *Monell* liability if the failure amounts

to 'deliberate indifference' to the rights of those with whom the city employees interact."

*Martin v. City of New York*, No. 11-CV-02862 ENV, 2012 WL 4569757, at *3 (E.D.N.Y.

Sept. 29, 2012) (citing *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S. Ct. 1197, 103 L.

Ed.2d 412 (1989)).  "In establishing deliberate indifference, the 'operative inquiry is

whether the facts suggest that the policymaker's inaction was the result of a conscious

choice rather than mere negligence.'" *Id.* (quoting *Amnesty America v. Town of West

Hartford*, 361 F.3d 113, 128 (2d. Cir. 2004) (internal citations and quotations omitted)).

"Thus, plaintiff[] must show that 'a policymaking official had notice of a potentially serious

problem of unconstitutional conduct, such that the need for corrective action or supervision

was obvious ... and the policymaker's failure to investigate or rectify the situation

evidences deliberate indifference, rather than mere negligence or bureaucratic inaction.'"

*Id.* (quoting *Amnesty America*, 361 F.3d at 128).  "Because the complaint itself admits that

the City was merely negligent in its hiring, training and [retention], it fails to state a *Monell*

claim on that theory." *Id.*   Furthermore, "[c]ourts have repeatedly held that it is improper to

consider claims not asserted in the complaint and raised for the first time at the summary

32

judgment stage." *Comerford v. Vill. of N. Syracuse*, No. 5:18-CV-01143 (BKS/TWD), 2021 WL 950974, at *27 (N.D.N.Y. Mar. 12, 2021)(citing *Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006) (declining to reach the merit of claims asserted for the first time at the summary judgment stage and not included in the complaint); *Gonzalez v. Dist. Council 37, AFSCME, AFL-CIO, SSEU Local 371*, No. 20-cv-551, 2021 WL 329852, at *2, 2021 U.S. App. LEXIS 2802 (2d Cir. Feb. 2, 2021) ("The district court did not err in declining to address this claim ... since the claim turned on an allegation not made in the amended complaint and was raised for the first time in opposition to the Union's motion for summary judgment."); *Wade v. Elec. Boat Corp*., No. 16-cv-2041, 2019 WL 4805031, at *3 n.2, 2019 U.S. Dist. LEXIS 169148 (D. Conn. Sept. 30, 2019)("Plaintiff attempts to allege additional adverse employment actions in her response to defendant's motion for summary judgment. Plaintiff may not raise new claims in her responsive briefing.")).  Thus, the Court does not consider the Fourth Cause of Action as asserting a federal claim.

Having dismissed all federal claims in this case, the Court has discretion to dismiss the supplemental state-law claims pled in the Complaint. *Federman v. Empire Fire & Marine Ins. Co.*, 597 F.2d 798, 809 (2d Cir. 1979).  In many cases, "'if [all] federal claims are dismissed *before trial* . . . , the state claims should be dismissed as well.'" *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 56 (2d Cir. 2004) (quoting *Castellano v. Bd. of Trustees*, 937 F.2d 752, 758 (2d Cir. 1991)).  If, however, "'the dismissal of the federal claim occurs late in the action, after there has been substantial expenditure in time, effort, and money in preparing the dependent claims, knocking them down with a belated rejection of supplemental jurisdiction may not be fair.  Nor is it by any means necessary.'"

*Id.* (quoting *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994) (internal citation omitted)).

While the Court recognizes that extensive discovery and motion practice has occurred in this matter, the Court concludes that the best use of judicial resources would be to dismiss the State claims without prejudice.  The Court notes that three of the remaining four state-law claims rely on *respondeat superior* liability that is not available under federal law, *see Agosto v. N.Y. City Dep't of Educ.*, 982 F.3d 86, 97-98 (2d Cir. 2020) (Federal law "expressly prohibits *respondeat superior* liability for municipalities," and "a plaintiff must demonstrate that 'through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged.'")(quoting *Bd. of Cty. Commr's of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 404 (1997) (emphasis in original)), assert claims under New York state common law for assault and battery, prima facie tort, negligence and recklessness, and negligent hiring, training, and retention, and Defendants raise the defense of New York qualified immunity to these claims.  The Court finds that a state court would be better equipped to address the questions raised by these issues, including determining whether state law qualified immunity would apply, and, if it does, the interplay between that defense and municipal liability.  The Court will therefore dismiss the state-law claims without prejudice to repleading in an appropriate forum. *See* N.Y. C.P.L.R. § 205.

## IV.   CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment, Dkt. No. 25, is **GRANTED** as to the Fifth, Sixth, Seventh, and Eighth Causes of Action, and

these causes of action are **DISMISSED.**   The Court also **DISMISSES** the First, Second,

Third, and Fourth Causes of Action **without prejudice to re-pleading in state court**.

Defendants' motion is **DENIED** without prejudice in all other respects.  Plaintiff's motion for

summary judgment, Dkt. No. 30, is **DENIED as moot**.

**IT IS SO ORDERED.**

Dated: September 27, 2021

Thomas J. McAvoy
Senior, U.S. District Judge